Opinion issued January 27, 2005
     











In The
Court of Appeals
For The
First District of Texas




NO. 01-03-00761-CR
NO. 01-03-00762-CR




DONALD SPARKS, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 155th District Court
Waller County, Texas
Trial Court Cause Nos. 02-02-11063, 02-02-11064




O P I N I O N 
          In separate indictments, appellant, Donald Sparks, was charged with the felony
offenses of murder of Deborah Lauren Alexander (Lauren), and aggravated assault
of Samuel Keith Thompson (Sammy).


 Appellant pleaded not guilty to the charges
before a single jury, which found him guilty of both offenses. The jury sentenced
appellant to 75 years in prison and a $10,000 fine for the murder of Lauren, and 10
years in prison and a $5,000 fine for the aggravated assault of Sammy, and the trial
court ordered that the sentences run concurrently. 
          In two issues, appellant contends that the trial court erred by (1) allowing the
jury to propound questions to a testifying witness, (2) denying appellant’s requested
jury charge of defense of property, and (3) denying appellant’s requested jury charge
of his right to self-defense against both Lauren and Sammy. The State did not file an
appellate brief for either conviction. We conclude that the trial court erred by failing
to properly instruct the jury on the law of self-defense and defense of property and
that appellant was harmed by the error; and thus, we reverse for a new trial on both
offenses.


Background
          In 2002, appellant was 70 years of age, retired, and a widower. Lauren and
appellant had been friends for three years; they did not have an intimate relationship,
although he allowed her to live with him at his trailer house for about a month. On
January 4, 2002, both appellant and Lauren smoked crack cocaine during the daytime. 
That night, appellant gave Lauren a ride to an icehouse after giving her some money. 
Appellant waited in his parked car while she went into the icehouse. When she
returned to appellant’s car, her friend, Sammy, joined them. Sammy and appellant
had been strangers before that evening. 
          Lauren, Sammy, and appellant went to various places for short lengths of time
of approximately 15 minutes at each location. Ultimately, appellant left Lauren and
Sammy at “Scott’s” trailer without a ride when appellant departed alone for his house. 
Sammy and Lauren, however, found a ride to appellant’s trailer, which was about
eight miles away.
          After Sammy and Lauren smoked some crack cocaine, they approached
appellant’s trailer and were allowed into the trailer by appellant. Appellant said that
he had no money to purchase gasoline that night, but that he would cash a check at
a bank the next day when the banks opened at 9 a.m., get gasoline, and take Sammy
and Lauren to Sammy’s residence in Hempstead. 
          At approximately 3:00 a.m., a man and woman appeared at appellant’s trailer
house. The woman, an acquaintance of appellant, asked to borrow money from him. 
Lauren became angry with the woman and argued and fought with her. While
holding scissors in her hand, Lauren pulled the woman’s hair, but the fight stopped
when appellant exhibited a sawed-off .410 shotgun. After the man and woman left
appellant’s trailer house, Sammy and Lauren slept on opposite sides of appellant’s
couch, while appellant lay on his bed. From that point on, appellant’s and Sammy’s
versions of the events are starkly different concerning appellant’s use of the sawed-off .410 shotgun and a .22 rifle.
Sammy’s Testimony
           Sammy testified as follows. Appellant lay on his bed with a .22 rifle next to
him as Sammy and Lauren slept on the sofa. When they all rose at about 9:00 a.m.,
appellant and Lauren started arguing again. Appellant retrieved his .22 rifle, pointed
it at Lauren, and ordered her to gather her clothes and leave. As she gathered her
belongings, Lauren told appellant that he could not call her names and that she wasn’t
scared of him or the gun. Appellant shot Lauren in the face with the .22 rifle. 
Appellant then turned to Sammy and pointed the .22 rifle at him. After Sammy
ducked behind a chair, he rushed at appellant and grabbed the end of the .22 rifle’s
barrel with his left hand, causing the gun to discharge a bullet that struck Sammy’s
left thumb. Sammy took possession of the .22 rifle. As Sammy tried to unlock the
door to leave the trailer, appellant, now armed with a .410 shotgun, shot at Sammy,
but missed him. Sammy opened the door and ran outside. Appellant shot at Sammy
again with the .410 shotgun, but missed him again. Sammy then heard another
muffled gunshot that sounded as if it came from inside the trailer house. Sammy ran
to a garden nursery nearby and called for police and an ambulance.
Appellant’s Testimony
          Appellant testified as follows. At around 3 a.m., when the woman who had
fought with Lauren left his trailer, he asked the woman to call police because “Lauren
was just totally out of control, and I . . . was afraid that they was gonna [sic] rob me
or kill me.” Appellant went to the restroom, and, upon returning to his bedroom, he
noticed that his .410 shotgun was missing, which caused him to continue to fear for
his life. As Sammy and Lauren slept, appellant sat upright on the bed holding the .22
rifle across his lap throughout the night.
          At about 9:00 a.m., when everyone rose, appellant offered to give Lauren a ride
to Sammy’s house or into town. He told Lauren that she had to get her clothes and
leave his trailer because there was a warrant for her arrest. Lauren asked him for $50
so that she could pay Sammy part of the $225 that she owed him, but appellant
refused.
          Lauren stabbed appellant three times in the arm with a pair of scissors, but 
appellant “really didn’t think Lauren would hurt [him.]” Sammy, who had hidden
appellant’s .410 shotgun inside his jacket, pulled out the .410 shotgun, pointed it at
appellant and said, “I have to have my money cause [sic] my wife will kill me if I
don’t get it,” which caused appellant to fear for his life. In a sudden reverse of
emotion, Lauren switched the focus of her aggression to Sammy and attacked him in
an attempt to protect appellant. 
          As Lauren fought Sammy to assist appellant, appellant thought, “[H]e is gonna
kill us both.” Appellant retrieved his .22 rifle from the bedroom and pointed it at
Sammy, who was on top of Lauren, beating her with his hands and with the sawed-off
.410 shotgun. After appellant “nudged” Sammy in the side and told him to quit,
Sammy “brought up the shotgun, and turned around real slow” and then grabbed
appellant’s .22 rifle, which discharged, shooting Lauren. Sammy grabbed appellant,
slung him around like a “rag doll,” and tried to shoot him with the .22 rifle, but it
would not fire. When Sammy pointed the .410 shotgun under appellant’s chin,
appellant used all of his strength to push the .410 shotgun off, which caused it to fire,
shooting Lauren a second time. Sammy threw down the .410 shotgun, picked up the
.22 rifle, and ran out the door. 
          Earlier that evening, appellant had told Sammy that the .410 shotgun was a
“single shot shotgun.” Appellant stated that he believed that was why Sammy
discarded the .410 shotgun before leaving the house. Appellant picked up the .410
shotgun, discarded the empty shell, reloaded a shell, and went outside. When Sammy
fell down outside appellant’s trailer, appellant shot at him, striking the side of the car
that was parked nearby. As he ran from the trailer, Sammy fired the .22 rifle back
towards appellant’s trailer. Appellant then called police from a nearby neighbor’s
house.Denial of Jury Charges
          In his second issue, appellant contends that the trial court erred by denying his
requested jury charges. Although appellant requested a defense-of-property jury
instruction by submitting proposed written jury instructions, the trial court refused to
instruct the jury on that defense. Additionally, the trial court refused to include jury
instructions on appellant’s right to use self-defense against both Lauren and Sammy
for both the murder and the aggravated assault charges. Instead, the trial court
instructed the jury, in the application paragraph for the murder charge, that appellant
had a right to self-defense as to Lauren only and instructed the jury, in the application
paragraph for the aggravated assault charge, that appellant had a right to self-defense
as to Sammy only.
          By obtaining adverse trial court rulings on his proposed written instructions,
appellant preserved error on his complaints concerning the denial of his requested
charges. See Tex. Code Crim. Proc. Ann. Art. 36.14 (Vernon 1999) (defendant
must distinctly specify each ground of objection to charge); see Chapman v. State,
921 S.W.2d 694, 695 (Tex. Crim. App. 1996) (holding that defendant preserves error
if request is specific enough to put trial court on notice of omission or error in charge;
requested charge need not be “in perfect form,” but only sufficient enough to call
error to trial court’s attention); see Vasquez v. State, 919 S.W.2d 433, 435 (Tex. Crim.
App. 1996) (holding that preservation of error relating to defensive issue in jury
charge is made by objection or submission of requested charge to court).
          A trial court must charge the jury on any defensive issue raised by the
evidence, “regardless of its substantive character.” Brown v. State, 955 S.W.2d 276,
279 (Tex. Crim. App. 1997). A defendant is entitled to an affirmative defensive
instruction on every issue raised by the evidence regardless of whether it is strong,
feeble, unimpeached, or contradicted, and even if the trial court is of the opinion that
the testimony is not entitled to belief. Id. (quoting Williams v. State, 630 S.W.2d 640,
643 (Tex. Crim. App. 1982)). The jury alone decides whether to accept or reject a
properly raised defensive theory. See Woodfox v. State, 742 S.W.2d 408, 410 (Tex.
Crim. App. 1987) (holding that trial judge who refuses to give instruction on
defensive issue because evidence supporting it is weak or unbelievable effectively
substitutes his judgment on weight of evidence for that of jury). In determining
whether the testimony of the accused raises an issue of self-defense, the truth of the
accused’s testimony is not at issue. Rodriquez v. State, 544 S.W.2d 382, 383 (Tex.
Crim. App. 1977). 
Defense of Property
          Our laws provide that a person may use non-deadly force to defend property
under certain circumstances. Section 9.41 of the Penal Code states the following:(a) A person in lawful possession of land or tangible, movable property
is justified in using force against another when and to the degree the
actor reasonably believes the force is immediately necessary to prevent
or terminate the other’s trespass on the land or unlawful interference
with the property. (b) A person unlawfully dispossessed of land or
tangible, movable property by another is justified in using force against
the other when and to the degree the actor reasonably believes the force
is immediately necessary to reenter the land or recover the property if
the actor uses the force immediately or in fresh pursuit after the
dispossession and; (1) the actor reasonably believes the other had no
claim of right when he dispossessed the actor; or (2) the other
accomplished the dispossession by using force, threat, or fraud against
the actor. 
  
Tex. Pen. Code Ann. § 9.41 (Vernon 2004). Our Penal Code further provides that
a person is justified in using deadly force to defend property under certain
circumstances, as follows: 
A person is justified in using deadly force against another to protect land
or tangible, movable property: (1) if he would be justified in using force
against the other under Section 9.41; and (2) when and to the degree he
reasonably believes the force is immediately necessary: (A) to prevent
the other’s imminent commission of arson, burglary, robbery,
aggravated robbery, theft during the nighttime, or criminal mischief
during the nighttime; or (B) to prevent the other who is fleeing
immediately after committing burglary, robbery, aggravated robbery, or
theft during the nighttime from escaping with the property; and (3) he
reasonably believes that: (A) the land or property cannot be protected or
recovered by any other means; or (B) the use of force other than deadly
force to protect or recover the land or property would expose the actor
or another to a substantial risk of death or serious bodily injury. 

Tex. Pen. Code Ann. § 9.42 (Vernon 2004). 
          According to appellant, Sammy pointed the .410 shotgun at him and demanded
his money, which caused him to fear for his life. Appellant testified that, in response
to this aggravated robbery, he armed himself with the .22 rifle and struggled with
Sammy, who used the sawed-off .410 shotgun to beat Lauren. Appellant further
testified that his .22 rifle discharged, when Sammy grabbed it, and shot Lauren. 
Without regard to its credibility, appellant’s testimony was sufficient to raise the issue
of his right to use deadly force to defend his property from aggravated robbery by
Sammy. The trial court erred, therefore, by denying a defense-of-property instruction
concerning appellant’s right to use deadly force to defend his property from Sammy
for both the murder and aggravated assault offenses, and we sustain that portion of
appellant’s complaint on appeal.
          Although, according to appellant’s testimony, Lauren had previously stabbed
appellant after he refused to give her more money, appellant clearly stated that, when
he armed himself with the .22 rifle that morning when Lauren was shot, Lauren was
in the course of defending appellant from Sammy’s threats with the .410 shotgun, and
he “really didn’t think Lauren would hurt [appellant.]” The trial court did not err,
therefore, by denying the defense-of-property instruction concerning Lauren, who,
by appellant’s own testimony was assisting him and not attacking or robbing him
when appellant acted to defend his property. We overrule the portion of appellant’s
complaint on appeal concerning denial of his request for a defense-of-property
instruction concerning Lauren. 
Self-Defense
          Our Penal Code provides that a person may use non-deadly force in self-defense under certain circumstances, as follows: 
Except as provided in Subsection (b),


 a person is justified in using force
against another when and to the degree he reasonably believes the force
is immediately necessary to protect himself against the other’s use or
attempted use of unlawful force. 

Tex. Pen. Code Ann. § 9.31(a) (Vernon 2004). However, to be justified in using
self-defense through the use of deadly force, our Penal Code provides: 
A person is justified in using deadly force against another: (1) if he
would be justified in using force against the other under Section 9.31;
(2) if a reasonable person in the actor’s situation would not have
retreated; and (3) when and to the degree he reasonably believes the
deadly force is necessary: (A) to protect himself against the other’s use
or attempted use of unlawful deadly force; or (B) to prevent the other’s
imminent commission of aggravated kidnapping, murder, sexual assault,
aggravated sexual assault, robbery, or aggravated robbery. 

Tex. Pen. Code Ann. § 9.32 (a) (Vernon 2004). 
          Although appellant testified that he had feared for his life as to Lauren the
night before she was killed, and that Lauren had stabbed him earlier that morning
after he refused to give her more money, he also clearly stated that, when he armed
himself with the .22 rifle on the morning that Lauren was shot, Lauren was in the
course of defending appellant from Sammy’s threats with the .410 shotgun, and
appellant “really didn’t think Lauren would hurt [him.]” The trial court did not err,
therefore, by refusing to instruct the jury on appellant’s right to self-defense as to
Lauren on the aggravated assault charge,


 and we overrule that portion of appellant’s
complaint on appeal. 
          According to his own testimony, appellant armed himself when Sammy pointed
the .410 shotgun at him and demanded his money, which caused appellant to fear for
his life. As Sammy beat Lauren with his hands and the .410 shotgun, appellant
“nudged” Sammy in the side and told Sammy to quit. Appellant’s .22 rifle discharged
and shot Lauren when Sammy grabbed at the .22 rifle. This testimony is sufficient
to raise the issue of appellant’s right to use deadly force in self-defense against
Sammy for both the murder charge and the aggravated assault charge.


 We conclude
that the trial court erred by failing to submit an instruction on self-defense as to
Sammy for the murder charge and sustain that portion of appellant’s issue on appeal. 
Because the aggravated assault offense charge contained an application paragraph
concerning appellant’s right to use self-defense against Sammy, no error concerning
the self-defense instruction occurred in that charge.
 Harm Analysis
          Having concluded that the trial court erred by failing to instruct the jury on
appellant’s right to use deadly force to defend his property as to Sammy for both the
murder and the aggravated assault offenses, and by failing to instruct the jury on
appellant’s right to use deadly force in self-defense as to Sammy for the murder
offense, we must determine whether the error harmed appellant. See Payne v. State,
11 S.W.3d 231, 232 (Tex. Crim. App. 2000); Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1984). Because appellant properly preserved the error by objecting
to the charge and by submitting his proposed jury instructions, we must reverse the
conviction and order a new trial if appellant suffered any actual harm, regardless of
degree. See Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (citing
Almanza, 686 S.W.2d at 171). To determine if there is any harm, we must weigh the
degree of harm in light of the entire jury charge, state of the evidence, counsel’s
arguments, and any other relevant information revealed by the trial record as a whole. 
See Almanza, 686 S.W.2d at 171. 
          1. The Jury Charge
          We begin our harm analysis by analyzing the jury charge itself. See id. 
Although the jury charge for the murder offense contained the law concerning self-defense generally, the application paragraph of the charge limited appellant’s right
to self-defense as against Lauren only—who, by appellant’s admission, was coming
to his aid when appellant armed himself. Appellant thus received no charge on his
right to use self-defense against the only attacker, Sammy. 
          In assessing whether appellant was harmed by the erroneous jury charge, we
also consider the appellate presumption that the jury is presumed to have understood
and followed the court’s charge, unless there is evidence to the contrary. See Hutch,
922 S.W.2d at 172. Under this presumption, we must presume that the jury followed
the erroneous instruction in the murder charge, which authorized the jury to take
Lauren’s, but not Sammy’s, actions into account. See id. Moreover, the erroneous
murder charge was contained in the application paragraph, the portion of the charge
that authorizes the jury to act. See id. It is not sufficient for the jury to receive an
abstract instruction on the law. Id. An abstract charge does not inform the jury of
what facts, if found by it, would permit the jury’s consideration of the contested
evidence. Id. at 173. Nothing in the record suggests that the jury did not understand
or follow the court’s charge, and we must presume that it is possible that appellant
was convicted by a jury that may have wanted to, but was not allowed to, take into
account Sammy’s actions when considering appellant’s self-defense claim to the
murder charge. See id. at 172. 
          Furthermore, both the murder and aggravated assault charges completely
exclude any defense-of-property instruction. Thus, both charges ignore appellant’s
right to assert his defense that Sammy unlawfully attempted to take appellant’s
property at gunpoint. 
          Once a defendant has produced sufficient evidence to raise a defense, the State
is required to disprove the defense beyond a reasonable doubt. Boget v. State, 40
S.W.3d 624, 626 (Tex. App.—San Antonio 2001), aff’d, 74 S.W.3d 23 (Tex. Crim.
App. 2002). The State was not required here to disprove the defense-of-property
defense beyond a reasonable doubt because the jury charges did not instruct the jurors
that the State had the burden of persuasion on the issue. Even if the jury had a
reasonable doubt about whether appellant was justified in using deadly force to
defend his property from Sammy, the charge did not allow the jury to acquit on that
basis.  
          2. The Evidence
          We examine next the state of the evidence, including contested issues and the
weight of the probative evidence. See Almanza, 686 S.W.2d at 171. The jury heard
two eyewitness accounts of the events. In Sammy’s version, appellant was the
aggressor. In appellant’s version, Sammy was the aggressor. The evidence from the
autopsy report stated that Lauren’s cause of death was a “gunshot wound and shotgun
wound to the head.” Because the medical examiner testified that there was no way
to know which wound Lauren received first, the physical evidence could be
consistent with either appellant’s or Sammy’s version of events, depending on whom
the jury believed. The deputy sheriff for the Waller County Sheriff’s Department
testified that he overheard appellant state that “two people had tried to rob him, that
he had shot one, and had killed the girl in his house.” The Sheriff’s testimony is
generally consistent with appellant’s trial testimony. 
          3. Counsel’s Argument
          We next examine the arguments of counsel. See id. It is clear from the record
that appellant’s entire defense was that he was acting to defend himself from the use
of deadly force by Sammy. Appellant’s counsel referred to self-defense and defense-of-property during voir dire, and argued these defenses in his opening statement, in
his closing arguments, and by eliciting testimony from appellant. In his closing
arguments to the jury, the prosecutor also repeatedly referred to appellant’s claims of
self-defense and defense-of-property in response to a threatened robbery by Sammy. 
          4. Other Relevant Information
          Lastly, we address any other relevant information revealed by the record of the
trial as a whole. See id. The record contains no information on the jury’s deliberation
or length of time of their deliberation. The record reveals no other relevant
information to assist us concerning our harm analysis.
          The trial court’s refusal to instruct the jury on appellant’s right to assert
defense-of-property as to Sammy on both the murder and aggravated assault offenses,
and appellant’s right to self-defense from Sammy as to the murder offense harmed
appellant because the trial court’s refusals denied appellant the opportunity of
requiring the jury to find against these defenses before assessing his guilt for the
charged offenses. The jury here was not instructed on justifications that would have
required acquittal if the jury resolved these factual issues in appellant’s favor. See
Boget, 40 S.W.3d at 627. We conclude that the error in the denial of these jury
instructions actually harmed appellant. We sustain appellant’s second issue.Conclusion
          The judgments of the trial court are reversed, and we remand for a new trial. 
 
 


 
                                                             Elsa Alcala
                                                             Justice


Panel consists of Chief Justice Radack and Justices Keyes and Alcala.
Publish. Tex. R. App. P. 47.2.